UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

JESUS PEREDA RAMOS,                     )        Case No. 10-CV-02143 DMS (JMA)
                                        )
                    Petitioner,         )
                                        )        **REPORT AND RECOMMENDATION**
              v.                        )        **DENYING PETITION FOR WRIT OF**
                                        )        **HABEAS CORPUS**
J. TIM OCHOA, Warden,                   )
                                        )
                    Respondent.         )
_____        )

I.      **INTRODUCTION**

        Jesus Pereda Ramos (hereinafter "Petitioner" or "Ramos"), a California state

prisoner proceeding pro se, filed a Petition for a Writ of Habeas Corpus on October 1,

2010, pursuant to Title 28, United States Code, Section 2254, challenging his June 25,

2007 conviction in San Diego Superior Court, case number SCD200065.  (Pet. at 1.)

Petitioner alleges (1) his right to a speedy trial was violated and (2) his right to a jury

trial for the imposition of an upper term in sentencing was violated, pursuant to

Cunningham v. California, 549 U.S. 270 (2007).  (Id. at 5.)

        Respondent J. Tim Ochoa (hereinafter "Respondent") filed an Answer on

January 18, 2011.  (Doc. No. 12.)  Respondent argues this Court should deny the

Petition because the California courts' rejection of Petitioner's first and second claims

was neither contrary to nor an unreasonable application of Supreme Court precedent

1

and Petitioner's second claim is unexhausted.  (Doc. No. 12-1, Mem. of P. & A. Supp. Answer at 2.)  Petitioner filed a Traverse on February 4, 2011, alleging his right to a speedy trial was violated; his second claim was exhausted; and his right to a jury trial under Cunningham, supra, for the imposition of an upper term in sentencing was violated.  (Traverse at 2, 4.)

The Court has considered the Petition, Respondent's Answer and Memorandum of Points and Authorities in support thereof, Petitioner's Traverse, and all supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends the Petition be DENIED.

## II.    FACTUAL BACKGROUND

Petitioner sexually molested his young stepdaughters R. and E. persistently over the course of nine years until the authorities were notified in May 1983.  (Lodgment No. 5, People v. Jesus Pereda Ramos, No. D052150, slip op. at 2-4 (Cal. Ct. App. Feb. 23, 2010).)  Petitioner was charged in June, 1983 and arrested in October, 1985.  (Id. at 7.)  Petitioner, who was released on his own recognizance on October 23, 1985 after signing the O.R. Agreement, fled to Mexico to avoid prosecution for the molestations.  (Id.)  Petitioner was re-arrested in 2006 when he attempted to cross into the United States from Mexico and was subsequently tried.  (Id.)

The following factual summary of Petitioner's trial is taken from the California Court of Appeal, Fourth Appellate District, Division One ("California Court of Appeal") opinion, pursuant to 28 U.S.C. § 2254(e)(1):

> The two victims (R. and E.), now adults ages 35 and 39, testified at trial, describing the sexual molestation that occurred when they were young girls.  The girls lived with Ramos, their mother (Carmen), and two brothers.  Ramos molested R. from about age three or four to 11, and he molested E. from about age seven to 12.
>
> In the first incident recalled by R., Ramos ducked her head under the water while she was taking a bath, causing her to feel as if she were drowning, and then carried her to his bed, laid her on her stomach, and

inserted his penis into her "genitalia."[1]  R. recalled another incident that
occurred when she was about eight years old while she was taking a nap.
Ramos turned her over and took off her pants.  She heard him unzip his
pants, and he then inserted his penis into her genital area.  The
molestation involving this type of intercourse occurred once or twice a
year for about nine years.  In the spring of 1983, he had "full intercourse
[with her] on the living room floor."  During the nine-year period Ramos
would also perform oral sex on her; this occurred less often than the
intercourse.  Additionally, he regularly touched her in a sexual manner.
When she was washing dishes, he would come and rub his penis against
her back.  He also touched her breasts.

The first incident E. recalled was that Ramos put her on his lap and
touched her while she tried to "jiggle away" from him.  He touched her on
the "breast area," tried to kiss her, and tried to coax her to "give in to his
advances."  The molestation was advanced to "full intercourse," anal sex,
and oral sex.  For a period of time while she was in elementary school,
Ramos had intercourse with her on a nightly basis while her mother was at
night school.  There were also several incidents of anal intercourse and
oral sex.  Ramos would "corner [her]" in the kitchen and touch her and try
to "[s]educe [her]."  The intercourse, anal sex, and oral sex continued
through her elementary school years.  He also made her touch his penis.

While E. was still in elementary school, E. told her mother what Ramos
was doing to her.  Her mother started to cry and said she would talk to
him.  When her mother confronted Ramos, he "beat the living day lights"
out of E.  When E. was about 11 or 12 years old, she asked R. if Ramos
was "touching her or bothering her."  R. started to cry, and "at that point,
[E.] knew" that R. was also being molested.  E. and R. went to their
mother, and E. told her mother that it was "happening to [R.] too."  Their
mother took one or both girls to a clinic to be examined by a doctor, but
never contacted the authorities.[2]

When E. was about 14 years old and in junior high school, she moved in
with her grandparents because she had started to menstruate and her
mother did not want her to get pregnant.  After E. left the home, Ramos
molested R. more frequently.  In May 1983, when R. was almost 12 years
old, her school showed a video about improper touching.  After seeing this
video, R. told her teacher that her stepfather had molested her.  The
authorities were summoned, and R. was removed from her home by the
social services department.

During the investigation of the case, R. was interviewed by a police officer,
a detective, and a hospital social worker.  Given the lengthy passage of
time, these individuals had little or no independent recollection of the case
at trial.  However, they referred to their written reports to detail the
information provided by R. during the interviews.  When interviewed by the
detective assigned to the case, R. and E. described numerous incidents of

---

[1]R. testified she did not understand anatomy when she was a little girl and she was not certain
which part of her genitalia was involved in the incident.

[2]According to a social worker who later interviewed R., R. stated that the doctor at the clinic who
examined her did not "find anything wrong with her."

sexual touching and intercourse occurring over the years, and specified the setting and time period in which several of the incidents occurred.

(Lodgment No. 5 at 2-5). The California Court of Appeal also reviewed the case presented by the defense:

> To refute the prosecution's case, the defense presented evidence to support its theories of fabrication and false memories, including that E. made up the molestation claims because she was unhappy about living with her mother and stepfather rather than with her grandparents (with whom she had lived up until age seven), E. implanted the molestation belief in R.'s mind, and persons who spoke to the girls at the time of disclosure implanted the molestation belief by asking leading questions. A psychologist testified about the problem of suggestibility in children, and stated that in the early 1980's there were no standard protocols for interviewing children about sexual abuse claims, interviewers may have been unaware of the problem of suggestibility, and there was a tendency to believe that if a child made an allegation it was likely true. E. and R.'s mother testified that she never saw any signs of molestation, and a doctor at a clinic who examined E. told her there were no indications of molestation.

> A medical doctor called by the defense opined that because of lack of research and misunderstandings about normal variations in children's genitalia in the early 1980's, observations about E.'s and R.'s genitalia set forth in medical reports from Children's Hospital could have been misinterpreted to reflect sexual abuse.[3] Several character witnesses (including Ramos's son and stepdaughter from another relationship, his nephew, and an attorney colleague) testified they had never seen Ramos engage in inappropriate touching of children. A psychologist who examined Ramos opined that he had personality characteristics that were consistent with persons who both do and do not sexually abuse children.

(Lodgment No. 5 at 5-6).

III.   **PROCEDURAL BACKGROUND**

On June 1, 1983, the People of the State of California filed a criminal complaint against Petitioner in the San Diego Superior Court, case no. F78416, alleging ten counts of various sexual violations with a minor.[4]  (Lodgment No. 1, Augment Clerk's Tr. (hereinafter "ACT"))  A warrant was issued and Petitioner was arrested in October 1985.

---

[3] The prosecution did not introduce the Children's Hospital medical reports into evidence; these reports were referred to solely during the defense evidentiary presentation.

[4] The complaint alleged four violations of Penal Code section 288(a), four violations of Penal Code section 261.5, and one violation of Penal Code sections 286(c) and 288a(c).  (ACT at 1-2.)

(Lodgment No. 1, Clerk's Tr. (hereinafter "CT") at 43-47; Lodgment No. 5 at 7.)  On October 15, 1985, Petitioner was arraigned, pled not guilty and was appointed counsel. (Lodgment No. 1, Supp. Clerk's Tr. (hereinafter "SCT") at 29; Lodgment No. 5 at 7.)  On October 23, 1985, he was released after signing the O.R. Agreement, which required Petitioner to appear for a felony disposition conference scheduled for November 27, 1985, and a preliminary hearing on December 6, 1985, in exchange for his release.  (CT at 49; Lodgment No. 5 at 7.)  On November 27, 1985, Petitioner chose not to appear and the court issued a bench warrant for his arrest.  (Lodgment No. 5 at 7, 17.)  Nearly 21 years later, in March 2006, Petitioner was arrested during an attempt to enter into the United States from Mexico.  (Id. at 7.)

On July 19, 2006, an Information was filed in the San Diego Superior Court, case number SCD200065, charging Petitioner with eight counts of various sexual acts with a minor.[5]  (CT at 1-4).  Petitioner was arraigned and pled not guilty to each of the eight charges on July 25, 2006.  (Id. at 235.)

On September 28, 2006, Petitioner moved to dismiss case no. SCD20065 for violation of his right to a speedy trial.  (Id. at 5-19.)  The trial court heard and denied without prejudice Petitioner's motion to dismiss on October 23, 2006.  (Id. at 237; Lodgment No. 8, Rep.'s Tr. on Appeal, Oct. 23, 2006.)  On May 25, 2007, Petitioner filed a Supplemental Motion to Dismiss for a violation of Petitioner's right to a speedy trial.  (CT at 54-58.)  After holding hearings on June 6 and 7, 2007, the court denied the motion.  (Lodgment No. 8, Rep.'s Appeal Tr., vol. 1 and 2).

On June 11, 2007, Petitioner's jury trial began.  (Lodgment No. 8, Rep.'s Appeal Tr. Vol. 3.)  The jury found Petitioner guilty of all eight charges on June 25, 2007.  (CT

---

[5](1) Lewd act upon a child in violation of Penal Code Section 288(a); (2) Unlawful Sexual Intercourse in violation of Penal Code Section 261.5(a); (3) Sodomy of Person Under 14 With 10 Yrs Difference in violation of Penal Code Section 286(c)(1); (4) Lewd Act Upon a Child in violation of Penal Code 288(a); (5) Unlawful Sexual Intercourse in violation of Penal Code Section 261.5(a); (6) Oral Copulation of a Person Under 14 in violation of Penal Code Section 288a(c); (7) Lewd Act Upon a Child in violation of Penal Code section 288(a); and (8) Lewd Act Upon a Child in violation of Penal Code section 288(a).  (CT at 1-4.)

1  at 152-159).  On December 5, 2007, the trial court sentenced Petitioner.[6]  (Id. at 224-
2  225.1.)

3          On May 19, 2009, Petitioner filed an appeal in the California Court of Appeal,
4  case no. D052150, challenging the judgment of conviction.  (Lodgment No. 2, People v.
5  Jose Pereda Ramos, Case No. D052150 (Cal. Ct. App. filed May 19, 2009).)  On
6  February 23, 2010, the California Court of Appeal, affirmed the judgment.  (Lodgment
7  No. 5.)  On April 2, 2010, Petitioner filed a Petition for Review in the California Supreme
8  Court.  (Lodgment No. 6, People v. Jose Pereda Ramos, Case No. S181433 (Cal. filed
9  April 2, 2010).)  On June 17, 2010, the California Supreme Court sitting en banc
10 summarily denied Petitioner's request for review.  (Lodgment No. 7, People v. Jose
11 Pereda Ramos, Case No. S181433 (Cal., rev'd en banc June 17, 2010) (docket).)

12         On October 1, 2010, Petitioner initiated this action in the Central District of
13 California, filing his Petition along with a request to proceed in forma pauperis.  (Pet.)
14 (Doc. No. 1 and 6.)  The case was transferred to this Court on October 14, 2010.  (Doc.
15 No. 4.)  On November 3, 2010, Hon. Dana M. Sabraw dismissed the case without
16 prejudice because Petitioner failed to allege exhaustion as to claims two and three and
17 to provide sufficient information to determine his financial status in order to proceed in
18 forma pauperis.  (Doc. No. 7.)  That same day, Petitioner paid the filing fee.  (Doc. No.
19 8.)  On November 15, 2010, Petitioner filed a Motion for Leave to Amend, abandoning
20 claims three and four.  (Doc. No. 9.)  On November 19, 2010 , this Court ordered the
21 matter reopened with regards to Claims One and Two and issued a briefing schedule.
22 (Doc. No. 10.)  On January 18, 2011, Respondent filed an Answer to the First Amended
23 Petition for Writ of Habeas Corpus.  (Doc. No. 12.)  On February 4, 2011, Petitioner filed
24 a Traverse.  (Doc. No. 14.)

25

26          [6]Petitioner received the upper term of eight years for count one; the middle term of eight months
    for count two; and the middle term of two years for counts 3 and 7, to be served consecutively for a total of
27  twelve years, eight months in state prison.  Petitioner received the upper term of eight years for count four;
    the upper term of three years for count five; and the upper term of eight years for count six, each to be
28  served concurrently with the twelve year, eight month sentence.  (CT at 224-225.1.)

## IV.    DISCUSSION

### A.    Scope of Review

Title 28, United States Code, Section 2254(a), as amended by the Anti-terrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, establishes the following scope of review for federal habeas corpus claims:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody <u>in violation of the Constitution or laws or treaties of the United States</u>.

28 U.S.C. § 2254(a) (emphasis added).  As amended, Title 28 United States Code, Section 2254(d) reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was <u>adjudicated on the merits</u> in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2) (emphasis added).  To obtain federal habeas relief, a petitioner must satisfy either section 2254(d)(1) or 2254(d)(2).  <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 403 (2000).  The Supreme Court interprets Section 2254(d)(1) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a <u>question of law</u> or if the state court decides a case differently than this Court has  on a set of<u> materially indistinguishable facts</u>.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

<u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000) (emphasis added); <u>see</u> <u>also</u> <u>Lockyer v.</u>

1   Andrade, 538 U.S. 63, 73-74 (2003).  Ninth Circuit precedent is persuasive authority

2   when determining whether a state court decision is an unreasonable application of

3   Supreme Court law and what law is clearly established.  Sims v. Rowland, 414 F.3d

4   1148, 1151 (9th Cir.), *cert. denied*, 546 U.S. 1066 (2005).  After Wright v. Van Patten,

5   552 U.S. 120 (2008) and Carey v. Musladin, 549 U.S. 70 (2006), however, circuit law

6   may not be used to fill open questions in the Supreme Court's holdings for purposes of

7   federal habeas analysis.  Moses v. Payne, 555 F.3d at 760 (citing Musladin, 549 U.S. at

8   76 and Crater v. Galaza, 491 F.3d 1119, 1126 & n.8 (9th Cir. 2007) (explaining that, in

9   Musladin, the Supreme Court "discussed and accepted" the principle that § 2254(d)(1)

10  imposes "limits on the relevance of circuit precedent"), cert. denied, 554 U.S. 922

11  (2008)).

12          The Supreme Court interprets section 2254(d)(2) as follows:

13                  [A] decision adjudicated on the merits in a state court and based on
        a factual determination will not be overturned on factual grounds unless
14      objectively unreasonable in light of the evidence presented in the
        state-court proceeding.
15

16  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) (emphasis added).  When there is no

17  reasoned decision from the state's highest court, this Court "looks through" to the

18  underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991).

19  If the dispositive state court order does not "furnish a basis for its reasoning," federal

20  habeas courts must conduct an independent review of the record to determine whether

21  the state court's decision is contrary to, or an unreasonable application of, clearly

22  established Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir.

23  2000) (overruled on other grounds by Lockyer v. Andrade, supra, 538 U.S. at 75-76);

24  accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court

25  need not cite Supreme Court precedent when resolving claims presented on direct or

26  collateral review.  Early v. Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the

27  reasoning nor the result of the state-court decision contradicts [Supreme Court

28  precedent]," id., the state court decision will not be "contrary to" clearly established

1   federal law.  Id.

2   **B.    Claim One - Speedy Trial**

3          Petitioner's first claim for habeas relief is predicated on his right to a speedy trial.

4   (Doc. No. 1, at 5.)  He contends law enforcement "did nothing" to locate him for the 21

5   years following his failure to appear at his pretrial hearing.  (Pet., at 5.)  During this time

6   he lived and practiced law in Mexico, traveled across the border without incident, and

7   maintained California identification.  (Id.)  This claim was raised to the California

8   Supreme Court in his petition for review and was denied without comment.

9   (Lodgements No. 6 and 7.)  The Court, therefore, looks through the summary denial to

10  the opinion furnished by the Court of Appeal, which ruled Petitioner's federal

11  constitutional right to speedy trial had not been violated.  (Lodgment No. 5.)  Pursuant to

12  28 U.S.C. § 2254(e)(1), the following summary of facts relevant to this claim is adopted

13  from the Court of Appeal's decision:

14          The original complaint against Ramos was filed on June 1, 1983, and a
            warrant issued for his arrest.  He was arrested in October 1985.  At his
15          arraignment on October 15, 1985, Ramos pleaded not guilty and the court
            granted his request for appointed counsel.  On October 23, 1985, Ramos
16          was released from jail on his own recognizance.  In the "Agreement for
            O.R. Release" signed by Ramos, he promised to appear in court on
17          November 27 and December 6, 1985, the dates set for a felony disposition
            conference and the preliminary hearing.  The O.R. agreement also
18          included his promise not to depart the state without the court's permission.
            In the agreement Ramos provided a Tijuana address on Calle Ricardo
19          Castro.  Ramos failed to appear on November 27, and a bench warrant
            was issued for his arrest.
20
            Ramos was not arrested until about 21 years later when he attempted to
21          cross the border from Mexico into the United States in 2006.  At the port of
            entry, Ramos presented a California DMV identification card.  Using the
22          identification card, the border guard entered a query into the computer and
            discovered the outstanding arrest warrant.
23
            In July 2006, the preliminary hearing was conducted, Ramos was bound
24          over for trial, and an information was filed.  On September 26, 2006,
            Ramos moved to dismiss the case based on a violation of his right to a
25          speedy trial.

26          Ramos submitted evidence showing that he is a licensed Mexican
            attorney, and during the 21-year period between his 1985 release and his
27          2006 arrest he lived at the Calle Ricardo Castro address in Tijuana that he
            provided in the O.R. release agreement.  Next door to his residence he
28          maintained his office with a sign displaying his name.  He never moved

back to San Diego County, but he maintained contacts in the county. From 1992 to 1993, he and ex-wife Carmen had a car registered with the California DMV with a San Diego County address.[7]  In 1992, he tithed to a church in San Diego County.  From about 1992 to 1995 he received mail at his cousin's residence in San Diego County; in 1995 he had a San Diego County bank account using his cousin's address; and in 1995 he obtained a California DMV identification card and registered a vehicle with the DMV using his cousin's address.  In 1997 he submitted a form to the United States Customs Service to import goods from Mexico.  From about 2004 to 2006 he received mail at his son's residence in San Diego County, and in 2005 he obtained a California DMV identification card using his son's address.  He provided his true name and date of birth on the DMV identification cards.  In 2005, he applied for United States citizenship, and obtained a Social Security card using his son's address.  His relatives, including at least one of the victims, knew where he lived in Tijuana.  Over the years he repeatedly crossed the border using DMV identification cards.

The authorities never contacted Ramos's relatives in San Diego County to inquire about him.  There was no showing the government tried to check for information about him through DMV records, or to contact him at his Tijuana address.  In 1986 the San Diego district attorney's office established an international Liaison Unit which has been used to locate fugitives in Tijuana and, with the cooperation of Mexican authorities, secured (sic) their apprehension.  This unit never attempted to locate Ramos or secure his apprehension.  In 2006 (apparently after his arrest), the unit communicated by phone or email with the Mexican authorities and was provided with information indicating that he was a licensed attorney in Mexico.

Relevant to the issue of prejudice, the parties submitted information concerning what evidence was and was not available after 21 years.  Both victims were available to testify.  Two of the school personnel who spoke to R. when she disclosed the molestation were not available (i.e., R.'s teacher was deceased and the defense had been unable to locate the school secretary).  The school had no records of the disclosure incident.  However, a school nurse who also spoke with R. was available.  The police officer, detective, and hospital social worker handling the case had little or no independent recollection of the case, but their written reports were available.  The social services report had been purged from the county's files, and the county social worker assigned to the case had no recollection of the case.  The doctors who examined the girls at Children's Hospital, as well as the medical reports they prepared, were available.  However, a medical forensics expert testified that it was not possible to properly evaluate the medical findings without magnified photographs of the genitalia, which were not included in the girls' medical files even though the technology was used in the 1980's.  The defense had been unable to locate a clinic where Carmen claimed to have taken E. For an examination and where the doctor had stated there was no evidence of abuse.

---

[7]The court noted "[t]he San Diego address on the car registration was actually a 'Postal Annex type address' frequently used to receive mail by people who live in Mexico.  (Lodgment No. 5 at 8, n.6).

1    (Lodgment No. 5 at 7-10.)

2        "In all criminal prosecutions, the accused shall enjoy the right to a speedy and

3    public trial."  U.S. Const. amend. VI.  The Fourteenth Amendment imposes upon the

4    states the obligation to uphold an accused's right to a speedy trial under the Sixth

5    Amendment.  Klopfer v. State of North Carolina, 386 U.S. 213, 222-23 (1967).  As

6    observed by the Court of Appeal, the evaluative criteria for post-indictment speedy trial

7    claims include "[1] whether delay before trial was uncommonly long, [2] whether the

8    government or the criminal defendant is more to blame for that delay, [3] whether, in

9    due course, the defendant asserted his right to a speedy trial, and [4] whether he

10   suffered prejudice as the delay's result."  (Lodgment No. 5, at 14, citing Doggett v.

11   United States, 505 U.S. 647, 651 (1992) and Barker v. Wingo, 407 U.S. 514, 530

12   (1972).  "[N]one of the four factors identified above [is] either a necessary or sufficient

13   condition to the finding of a deprivation of the right of speedy trial."  Barker, 407 U.S. at

14   533.  The factors are related and "must be considered together with such other

15   circumstances as may be relevant.  In sum, these factors have no talismanic qualities;

16   courts must still engage in a difficult and sensitive balancing process."  Id.

17   **1.    Length of the Delay**

18       Pretrial delays sufficient to presume prejudice trigger inquiry into the remaining

19   criteria, Barker, 407 U.S. at 530, and such a presumption "intensifies over time."

20   Doggett, 505 U.S. at 652.  Courts measure the length of delay as the period between

21   indictment and time of trial, United States v. Gregory, 322 F.3d 1157, 1162 (9th Cir.

22   2003), presuming prejudice when pretrial delays approach one year.  Doggett, 505 U.S.

23   at 652, n.1; see also United States v. Serrano, No. 03CR3061-L, 2011 WL 2003285,

24   slip op. at *2 (9th Cir. May 23, 2011) (seven year delay triggers further inquiry); United

25   States v. Mendoza, 530 F.3d 758, 762 (9th Cir. 2008) (ten year delay triggers further

26   inquiry).  Petitioner was released on his own recognizance in 1985 and not brought to

27   trial until 2006, approximately twenty-one years after he fled prosecution.  (Lodgment

28   No. 5, at 2.)  This delay well exceeds the one year delay courts generally tolerate and

11

1   the eight-and-one-half year delay <u>Doggett</u> termed extraordinary.  <u>Doggett</u>, 505 U.S. at

2   652, n.1.  The California Court of Appeal, thus, properly determined this twenty-one

3   year delay created a presumption of prejudice, justifying further inquiry into the

4   remaining <u>Barker</u> factors.  (Lodgment No. 5, at 16.)

5   **2.      Reason for the Delay**

6           The crucial question is whether it was reasonable for the California Court of

7   Appeal to conclude Petitioner was more to blame for the delay than Respondent.  See

8   <u>Williams</u>, *supra*, 529 U.S. at 412-13; <u>Doggett</u>, 505 U.S. at 651.  "The government has

9   'some obligation' to pursue a defendant and bring him to trial."  <u>Mendoza</u>, 530 F.3d at

10  762-63, quoting <u>Sandoval</u>, 990 F.2d at 485, *cert. denied*, 510 U.S. 878 (1993).

11  Defendants pursued by the government with reasonable diligence have no speedy trial

12  claims.  <u>Doggett</u>, 505 U.S. at 656.  "When the defendant seeks to avoid detection by

13  American authorities and any post-indictment delay can be attributed to him, he waives

14  the right to a speedy trial."  <u>Sandoval</u>, *supra*, 990 F.2d at 483 (internal quotations

15  omitted).  When a defendant attempts to avoid detection, the government need not

16  "'make heroic efforts to apprehend a defendant who is purposefully avoiding

17  apprehension.'"  <u>Id.</u> at 485 (quoting <u>Rayborn v. Scully</u>, 858 F.2d 84, 90 (2nd Cir. 1988)).

18  "When the defendant is not attempting to avoid detection and the government makes no

19  serious effort to find him, the government is considered negligent in its pursuit,"

20  <u>Mendoza</u>, *supra*, 530 F.3d at 762-63, giving rise to a presumption of prejudice.

21  <u>Doggett</u>, 505 U.S. at 657.

22          The California Court of Appeal evaluated the evidence submitted by Petitioner

23  and weighed his actions against those of the government to assign responsibility for the

24  delay, concluding:

25              The government's role in the delay was, at most, passive negligence
                arising from the failure to try to secure the cooperation of Mexican
26              authorities to bring Ramos to San Diego.  When the government's
                arguable passive negligence is balanced against Ramos's conscious
27              decision to ignore the pending charges, the balance falls on the side of no
                speedy trial violation."

28

1   (Id. at 20.)  The court's characterization of the government's inaction as passive

2   negligence recognizes a weighing of each party's actions must take place to assign

3   responsibility for the delay.  See Doggett, 505 U.S. at 651.  The court's conclusion that

4   the government was passively negligent puts the weight of the reason for delay on

5   Petitioner, necessarily requiring Petitioner's active avoidance of prosecution.  The

6   record can be reasonably interpreted to reach such a result.  The court's assessment of

7   the government's inaction in pursuing Petitioner as negligence was reasonable – the

8   government made very little effort to track Petitioner.  In comparison to Petitioner's

9   actions, which suggest Petitioner actively evaded discovery, the court found the

10  government's negligence did not weigh in favor of a speedy trial violation.  (Id. at 20.)

11  After his intentional flight and throughout the course of twenty-one years, Petitioner

12  initiated contact with various government entities, providing them various addresses

13  which were merely artifice, for he never lived at those addresses and in at least one

14  instance, the address was not a residence, but a mail box.[8]  Petitioner's use of false

15  addresses clouds his contention he lived openly in Tijuana with the United States

16  government's full knowledge.  Petitioner provided the government with addresses

17  indicating he was living in California, not Tijuana, which could reasonably suggest the

18  purpose of Petitioner's contacts with the government was to mislead the government

19  about his true location.

20      Applying the California Court of Appeal's rationale, Petitioner's active evasion

21  compared with the government's passive negligence in tracing his whereabouts weighs

22  against Petitioner.  Doggett instructs that Petitioner is not entitled to relief on this ground

23  so long as his active evasion "is more to blame for that delay."  Doggett, 505 U.S. at

24  651.  Accordingly, the court reasonably concluded Petitioner was a greater factor in the

25

26  _____

27      [8]  Changing residences does not in itself indicate active evasion.  See Serrano, supra, at *3.  In
    Serrano, the defendant, like Petitioner, had numerous contacts with the government using his own name.

28  Id.  Serrano, however, unlike Petitioner, provided the government his true residential address during those
    contacts and was unaware of the indictment against him.  Id.

1   reason for the delay than the government.

2   **3.**     **Petitioner's Assertion of His Speedy Trial Right**

3        Where a defendant who knows of the charges or indictment against him but

4   takes action to avoid arrest, the "third factor, concerning invocation of the right to

5   speedy trial, would be weighed heavily against him." Doggett, 505 U.S. at 653. While a

6   defendant may successfully demonstrate his right to a speedy trial was denied without

7   having asserted his right, finding success will prove difficult. Barker, 407 U.S. at 532.

8   After all, "the more serious the deprivation, the more likely a defendant is to complain."

9   Barker, 407 U.S. at 531.

10       In evaluating the circumstances of Petitioner's invocation of his right to a speedy

11   trial, the California Court of Appeal stated:

12         Ramos knew he was charged and that the government was prepared to
          proceed with the accusation against him. . .The fact that he knew of the
13        charges and knew he was required to appear supports that he
          intentionally decided not to appear in an attempt to avoid prosecution . . . .
14        Further, during the 21-year period before Ramos was detained at the
          border, he could have elected at any time to effectuate his speedy trial
15        right by contacting the authorities.

16   (Lodgment No. 5 at 17-18.) "[T]he record shows Ramos failed to appear even

17   though he knew about the charges. Thus, he can be properly faulted for failing to

18   invoke his speedy trial right." (Id. at 20.) Petitioner knew of the charges against

19   him in 1985 when he was arrested and arraigned (CT at 43-47), and was well

20   aware of the requirement he appear in November and December 1985 when he

21   signed the O.R. Agreement. (Id. at 49.) Only after his 2006 arrest, having waited

22   twenty-one years, did Petitioner finally choose to invoke his right to a speedy trial

23   by a motion to dismiss. (Id. at 5-19.) The Court of Appeal's finding, therefore,

24   that such a lengthy delay with full knowledge of the charges weighs against a

25   violation of Petitioner's right to a speedy trial is reasonable and consistent with

26   U.S. Supreme Court precedent.

27   / /

28   / /

**4.    Prejudice**

Post-indictment delay can give rise to three forms of prejudice: "oppressive pretrial incarceration, anxiety and concern of the accused, and the possibility that the [accused's] defense will be impaired by dimming memories and loss of exculpatory evidence." Doggett, 505 U.S. at 654, quoting Barker, 407 U.S. at 532 (internal quotations omitted); see also Gregory, 322 F.3d at 1163.  "Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. (internal citations omitted); see also Mendoza, 530 F.3d at 764.  "This final form of prejudice is not only the most important, it is also the most difficult to prove because time's erosion of exculpatory evidence and testimony can rarely be shown."  Mendoza, 530 F.3d at 764, quoting Doggett, 505 U.S. at 655 (internal citations omitted).  "In other words, excessive delays can compromise[ ] the reliability of a trial in ways that neither party can prove or, for that matter, identify." Id. (internal citations omitted).  "Due to these concerns, no showing of prejudice is required when the delay is great and attributable to the government." United States v. Shell, 974 F.2d 1035, 1036 (9th Cir.1992) (citing Doggett, 505 U.S. at 657-58, 112 S.Ct. 2686) (internal quotations omitted).  When the defendant bears most of the responsibility for the delay, the defendant must show actual prejudice.  Doggett, 505 U.S. at 656.

The only form of pretrial prejudice of which Petitioner has complained is impairment of his defense.  (Lodgment No. 2 at 17; Lodgment No. 4 at 3; Lodgment No. 6 at 6.)  Petitioner suffered no oppressive pretrial incarceration because he was released on his own recognizance in 1985.  (CT at 49.)   Furthermore, Petitioner has not raised any claim of anxiety or concern he may have suffered, and the record supports no such inference.  (Lodgment No. 8, Rep.'s Appeal Tr. at 100, 120.)  As shown above, the California Court of Appeal reasonably concluded Petitioner was primarily responsible for the delay, requiring Petitioner to demonstrate actual prejudice in presenting an unimpaired defense.  See Doggett, 505 U.S. at 656.

Petitioner alleges the delay prejudiced his defense because of unavailable witnesses, witnesses with no memory of events, and the loss or absence of physical evidence.[9]  (Lodgment No. 6.)  The California Court of Appeal disagreed, stating "[t]he record supports that the presumption of prejudice arising from the 21-year delay was sufficiently rebutted so that the potential for prejudice does not overcome the heavy weight accorded to Ramos's responsibility for the delay."  (Lodgment No. 5 at 18-19.)  The court reasoned:

> If the case had gone to trial in the 1980's, the defense may have been able to more fully examine how the interviews were conducted, but the defense would not have had the benefit of any subsequently-developed information concerning suggestibility and contamination.  Further, because the victims were adults by the time the case came to trial, Ramos had the opportunity to cross-examine them when their rational faculties were fully developed.  Thus, the defense was able to question the adult victims about their claims of abuse without the difficulties associated with child witnesses.  Ramos has not shown that the potential loss of contamination evidence so eviscerated the defense as to tip the scales in favor of finding a violation of his speedy trial right.

(Id. at 19.)

The court's assessment is reasonable.  Petitioner confronted witnesses against him and introduced testimony to undermine the credibility of interviewing techniques, medical examinations and reports.  He cross-examined both of his victims.  (Lodgment No. 8 at 331, 439.)  He cross-examined Michelle Neumann-Ribner, the interviewer who wrote a report regarding her interview with the victims and had no specific memory of the case.  (Lodgment No. 8, Rep.'s Tr. On Appeal at 480-519.)  Petitioner questioned her regarding the interviewing techniques she used with the victims, raising the issue of whether those techniques subjected the victims' allegations to suggestibility and contamination.  (Id.)  Petitioner examined social worker Ted Silva, who was named in a police report as having worked on the case, but had no recollection of the case.  (Lodgment No. 8, Rep.'s Tr. On Appeal at 61-64.)  Petitioner's intended purpose in

---

[9]  Petitioner states in the Traverse, without elaboration, that he was prejudiced by the delay.  Petitioner raised these reasons as to why his defense was impaired in his arguments before the California Supreme Court and California Court of Appeal.

examining Silva, aside from exposing his lack of memory of the case, was to inquire

about his contact with one of the victims, presumably to inquire into his contamination of

the victims' allegations.  (Id.; Lodgment No. 6 at 9.)  The witnesses unavailable to

Petitioner were those school officials Petitioner intended to confront regarding

suggestibility and contamination.  Mr. Fricke, one of the victim's teachers, is deceased.

(Lodgment No. 6 at 21.)  Victim R. testified she only told Mr. Fricke something was

wrong and that she preferred to speak with a female.  (Lodgment No. 8, Rep.'s Tr. On

Appeal at 347.)  He did not ask further questions.  (Id.)  The other two school officials

could not be found.  (Id.)  Petitioner, by use of "subsequently-developed information

concerning suggestibility and contamination," (Lodgment No. 5 at 18-19), was able to

call into question the credibility of the witnesses, examinations and reports.  If not for

Petitioner's twenty-one year evasion, this information would have been unavailable to

him and he would not have benefitted from its use.

Petitioner also examined Dr. Adams, who testified she could not properly analyze

the medical report without photographs.  (Lodgment No. 8, Rep.'s Tr. On Appeal at 639-

40.)  Petitioner argues that because no photographs were taken even though the

technology to take the photographs existed at the time of the examination, he was

prejudiced.  (Lodgment No. 6 at 23.)  Even without the photographs, Dr. Adams testified

the report contained conclusions which at the time were sound, but have since been

debunked.  (Lodgment No. 8, Rep.'s Tr. on Appeal at 621-22.)  She testified:

> Doctors, in the early '80s, were asked to examine children and – who had
> described being sexually abused and to say whether or not there were any
> physical signs in that child's examination to support the allegations of
> abuse.  And, unfortunately, there was very, very little known about what
> the normal variation is in the appearance of the hymen and the genital
> tissues and the anal tissue in children who had not been abused.  And so,
> as we were examining children who said that they had been abused and
> we saw something that looked unusual, we would conclude, oh, this must
> be due to that abuse.  And the people who were the pioneers in doing the
> examinations, then taught everybody else at conferences that this is what
> you see in abused children and so, if you see this, it means the child was
> abused.  And that was a leap that should not have been taken, but it was.

(Id.)  Considering this testimony, Petitioner was able to test the credibility of the reports

1   concerning the medical examinations of his victims.  (Id. at 636-50.)

2       Despite Petitioner's allegations of prejudice, he benefitted from his twenty-one

3   year evasion.  Had Petitioner not fled prosecution and instead faced trial in 1985, he

4   would not have had access to the developments Dr. Adams discussed, nor would he

5   have had access to developments in interviewing techniques.  Petitioner bears the

6   primary responsibility for the delay and is, therefore, primarily responsible for the

7   unavailable witnesses and fading memories of which he now complains.  The California

8   Court of Appeal reasonably concluded the prejudice suffered by Petitioner simply did

9   not outweigh his responsibility for the delay.  Accordingly, this Court recommends the

10  petition be DENIED as to Ground One.

11  **C.    Claim 2 - Cunningham/Ex Post Facto**

12      Petitioner alleges the trial court sentenced him to the upper term on several

13  counts of his conviction without a jury determination to support the upper term sentence

14  as required by Cunningham.  (Pet. at 5.)  Petitioner elaborates on this claim in his

15  Traverse, stating "the alleged crime occurred prior to the Legislature amending

16  California Penal Code Section 1170(b), and that he should be sentenced under the

17  provisions of Cunningham to a middle term thereof."  (Traverse at 4) (emphasis added).

18  Essentially, Petitioner alleges the trial court's upper term imposition for his sentence

19  violated the ex post facto clause because it was based on legislative amendments not in

20  force when the alleged crimes were committed.  (Id.)

21  **1.    Petitioner's Second Claim is Unexhausted.**

22      "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust

23  available state remedies, thereby giving the State the 'opportunity to pass upon and

24  correct' alleged violations of prisoners' federal rights.' " Baldwin v. Reese, 541 U.S. 27,

25  29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004), quoting Duncan v. Henry, 513 U.S. 364,

26  365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (internal citation omitted).  A

27  state prisoner's federal habeas petition may not be granted if state remedies are

28  unexhausted.  See 28 U.S.C. § 2254(b)(1)(A).  A petitioner has satisfied the exhaustion

1   requirement if he has "fairly presented" his federal claim to the highest state court with

2   jurisdiction to consider it...."  Johnson v. Zenon, 88 F.3d 828, 829 (9th Cir. 1996);

3   Sandgathe v. Maass, 314 F.3d 371, 376 (9th Cir. 2002).  State prisoners can satisfy the

4   "fair presentation" procedural prerequisite in several ways, "for example, by citing in

5   conjunction with the claim the federal source of law on which he relies or a case

6   deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"

7   Baldwin, 541 U.S. at 32 (holding a state prisoner ordinarily does not "fairly present" a

8   federal claim to a state court if that court must read beyond a petition, a brief, or similar

9   papers to find material that will alert it to the presence of such a claim).

10          Petitioner's second claim was not presented in his Petition for Review to the

11   California Supreme Court.  (Lodgment No. 6.)  The only issue raised there was the

12   alleged violation of his speedy trial rights.  (Id.)  Petitioner admits he did not present his

13   second claims as a claim for habeas relief before the California Supreme Court.  (Pet.,

14   at 5.)  Thus, this claim is unexhausted.  Federal courts cannot grant petitions that

15   contain both exhausted and unexhausted claims, which are often referred to as "mixed

16   petitions."  See Rose v. Lundy, 455 U.S. 509, 522.  The filing of a mixed petition renders

17   it subject to dismissal.  Id.  Petitioner was previously informed his Petition is mixed, in

18   part due to the inclusion of this claim.  (Doc. No. 7.)  He was cautioned the mixed

19   petition was subject to dismissal and was offered four possible options to proceed.  (Id.)

20   Petitioner responded by abandoning only his third and fourth claims, leaving his

21   unexhausted second claim and his mixed Petition still pending before the Court and

22   subject to dismissal.  (Doc. No. 9.)

23          Notwithstanding the total-exhaustion rule, there is no statutory impediment to

24   denying a mixed petition on the merits in its entirety.  "An application for a writ of habeas

25   corpus may be denied on the merits, notwithstanding the failure of the applicant to

26   exhaust the remedies available in the courts of the state." 28 U.S.C.A. § 2254(b)(2);

27   See also Cassett v. Stewart, 406 F.3d 614, 623-624 (9th Cir. 2005) (finding § 2254(b)(2)

28   codifies the decision in Granberry v. Greer, 481 U.S. 129, 135 (1987) permitting a

federal court to deny an unexhausted petition on the merits when "the applicant does

not raise even a colorable federal claim").  As discussed below, Petitioner's second

claim is without merit.  Dismissal is, therefore, appropriate on this basis, as well as on

the grounds that it is unexhausted.

**2.      Petitioner's Second Claim Fails on the Merits**.

The California Court of Appeal found the upper term sentence permissible:

[E]ffective March 2007, the Legislature amended section 1170, subdivision
(b) so that the upper term, rather than the middle term, is the prescribed
statutory maximum.  When Ramos was sentenced in November 2007, this
amendment was operative.  Accordingly, the trial court was authorized to
select upper terms based on its own factual findings because an upper
term is not beyond the statutory maximum.

(Lodgment No. 5 at 21-22.)

"No Bill of Attainder or ex post facto Law shall be passed."  U.S. CONST. art. I, §

9, cl. 3.  An ex post facto law "imposes a punishment for an act which was not

punishable at the time it was committed; or imposes additional punishment to that then

prescribed."  Cummings v. Missouri, 71 U.S. 277, 325-26 (1867); see also Calder v.

Bull, 3 U.S. 386 (1798).  "The controlling inquiry is whether retroactive application of the

change [in state law] create[s] a sufficient risk of increasing the measure of punishment

attached to the covered crimes."  Scott v. Baldwin, 225 F.3d 1020, 1022, quoting Garner

v. Jones, 529 U.S. 244, 259 (2000) (internal quotations omitted).  The focus is not on

whether a legislative change produces "some ambiguous sort of 'disadvantage,' " but

rather "on whether any such change increases the penalty by which a crime is

punishable." Garner, 529 U.S. at 255 (quoting California Dep't of Corrections v. Morales,

514 U.S. 499, 506-07 n.3 (1995)).  "A law does not violate the clause if it 'created only

the most speculative and attenuated risk of increasing the measure of punishment

attached to the covered crimes.' " Brown v. Palmateer, 379 F.3d 1089, 1093 (9th

Cir.2004) (quoting Morales, 514 U.S. at 513); see also Boulware v. Marshall, 621

F.Supp.2d 882, 893-94 (C.D.Cal.2008).

Cunningham, supra, held California's determinate sentencing law, pursuant to

which a judge would impose an upper, rather than middle term sentence after finding an aggravating circumstance, violated a defendant's right to a trial by jury.  Cunningham, 549 U.S. at 288-89 (2007).  "[T]herefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum."  Id. at 288.  To modify its system, California may "permit judges genuinely to exercise broad discretion within a statutory range, which everyone agrees encounters no Sixth Amendment shoal."  Id. at 294 (internal quotations omitted).

On March 30, 2007, in response to the Supreme Court's suggestion in Cunningham that California could cure any constitutional defect in section 1170(b) by leaving the selection of an appropriate sentence to the judge's discretion, the State Legislature enacted Senate Bill 40, which amended section 1170(b).  Id. at 293-94; Cal. Stats., ch. 3, § 2, eff. Mar. 30, 2007.  Under amended section 1170(b), a trial court still exercises its discretion in selecting among the upper, middle or lower terms, but no additional factual finding is required to impose an upper or lower term.  CAL. PENAL CODE § 1170(b); Butler v. Curry, 528 F.3d 624, 652 n. 20 (9th Cir.2008) ("imposition of the lower, middle, or upper term is now discretionary and does not depend on the finding of any aggravating factors"); People v. Sandoval, 41 Cal.4th 825, 843-45 (2007).

In Sandoval, the California Supreme Court found it could judicially reform former section 1170(b) in a manner consistent with Senate Bill 40 to resentence defendants whose sentences were invalid under Cunningham.  Id. at 845-46.   Sandoval held "the removal of the provision calling for imposition of the middle term in the absence of any aggravating or mitigating circumstance is not intended to – and would not be expected to – have the effect of increasing the sentence for any particular crime" [and therefore] "the federal Constitution does not prohibit the application of the revised sentencing process ... to defendants whose crimes were committed prior to the date of [this] decision."  Id. at 855, 857; see also Chioino v. Kernan, 581 F.3d 1182, 1185 (9th Cir. 2009) ("no ex post facto concerns are generated by remanding for resentencing for a Cunningham violation if the sentencing court follows the California Supreme Court's

1   instructions in Sandoval."); Butler v. Curry, 528 F.3d 624, 652 n.20 (9th Cir. 2008)

2   (finding Sandoval controlled by United States v. Dupas, 419 F.3d 916 (9th Cir 2005)

3   (finding retroactive application of judicially-reformed federal sentencing guidelines under

4   United States v. Booker, 543 U.S. 220 (2005) not violative of the ex post facto clause)).

5   If retroactive application of post-Cunningham judicially-reformed sentencing endorsed in

6   Sandoval does not violate the ex post facto clause, then neither does retroactive

7   application of the sentencing guidelines in Senate Bill 40.

8          Petitioner committed his crimes prior to the legislative amendment in Senate Bill

9   40.  Petitioner was sentenced after this legislative amendment was operative.  Because

10  the legislative amendment is applicable retroactively, Petitioner's sentence did not

11  violate the ex post facto clause.  The California Court of Appeal's rejection of

12  Petitioner's second claim for the same reasons above, was neither "contrary to, or

13  involved an unreasonable application of, clearly established Federal law, as determined

14  by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Accordingly, this

15  Court recommends Petitioner's second claim be DENIED.

16  **V.      CONCLUSION AND RECOMMENDATION**

17         Having reviewed the matter, the undersigned recommends that Petitioner's

18  Petition for Writ of Habeas Corpus be DENIED.  This report and recommendation is

19  submitted to the Honorable Dana M. Sabraw, the United States District Judge assigned

20  to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

21         IT IS ORDERED that no later than September 20, 2011, any party may file

22  written objections with the Court and serve a copy on all parties.  The document should

23  be captioned "Objections to Report and Recommendation."

24         IT IS FURTHER ORDERED that any reply to the objections shall be filed with the

25  Court and served on all parties not later than September 30, 2011.  The parties are

26  advised that failure to file objections within the specified time may waive the right to

27  / /

28  / /

1  raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d

2  449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

3  DATED:  August 30, 2011

4

5                                          Jan M. Adler
                                           U.S. Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28